SIERRA CLUB, Jerry Williams, Defenders of the Ouachita Forest, Sherry Balkenhol, Bill Greer, Stan Heard, Plaintiffs,

v.

F. Dale ROBERTSON, in his official capacity as Chief, U.S.D.A. Forest Service, John E. Alcock, in his official capacity as Regional Forester, Southern Region, U.S.D.A. Forest Service, John M. Curran, in his official capacity as Supervisor, Ouachita National Forest, Larry Theivagt, in his official capacity as Mena District Ranger, U.S.D.A. Forest Service, George Landrum, in his official capacity as Poteau District Ranger, U.S.D.A. Forest Service, Paul Fuller, in his official capacity as Tiak District Ranger, U.S.D.A. Forest Service, Don Monk, in his official capacity as Oden District Ranger, U.S.D.A. Forest Service, John Archer, in his official capacity as Jessieville District Ranger, U.S.D.A. Forest Service, James Watson, in his official capacity as Caddo District Ranger, U.S.D.A. Forest Service, Robert Raines, in his official capacity as Womble District Ranger, U.S.D.A. Forest Service, Douglas Webb, in his official capacity as Cold Springs District Ranger, U.S.D.A. Forest Service, Eugene Hayes, in his official capacity as Fourche District Ranger, U.S.D.A. Forest Service, Defendants,

Arkansas Forestry Association, Ouachita National Forest Timber Purchasers Group, and Region 8 Forest Service Timber Purchasers Council, Intervenors.

Civ. No. 90–2150.

United States District Court,
W.D. Arkansas,
Fort Smith Division.

April 25, 1991.

Nunc pro tunc April 22, 1991.

Mary M. Rawlins, Mena, Ark., for plaintiffs.

Charles Smith, Asst. U.S. Atty., Fort Smith, Ark., and Rebecca A. Donnellan and

David F. Shuey, U.S. Dept. of Justice, Washington, D.C., for defendants.

Searcy W. Harrell, Jr., Roberts, Harrell & Lindsey, P.A., Camden, Ark., for intervenor-plaintiff Arkansas Forestry Ass'n.

Thomas R. Lundquist and Steven P. Quarles, Crowell & Moring, Washington, D.C., for other intervenors-plaintiffs.

## MEMORANDUM OPINION

MORRIS SHEPPARD ARNOLD, District Judge.

Plaintiffs in this case contend that the 1986 Land and Resource Management Plan for the Ouachita National Forest ("1986 LRMP") and the Plan as amended in March of 1990 ("Amended LRMP" or "1990 LRMP") violate the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332, the National Forest Management Act (NFMA), 16 U.S.C. § 1600 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.* They also challenge the adequacy of the Final Environmental Impact Statements ("FEIS") prepared in conjunction with the Amended LRMP, and the Records of Decision ("ROD") adopting the Amended LRMP and the FEIS. Finally, plaintiffs' second amended complaint alleges that two of the Forest Service's timber sales decisions violate the requirements of NEPA and NFMA.

Intervening events, in particular the adoption of the Amended LRMP, which has completely superseded the 1986 LRMP, and a recent decision by the Forest Service to vacate the two contested timber sales decisions, has rendered claims regarding these issues moot.[1] Accordingly, defendants' motion to dismiss these claims can be granted summarily as there is no prospect for relief nor an active "case or controver-

sy" as required for continuing jurisdiction under Article III of the U.S. Constitution. *See, e.g., National Wildlife Federation v. Hodel,* 839 F.2d 694, 741 (D.C.Cir.1988) (challenge to withdrawn regulations is moot); *Defenders of Wildlife v. Endangered Species Scientific Authority,* 725 F.2d 726, 731 (D.C.Cir.1984) (challenge to changed guidelines is moot).

As to the remaining claims, the Forest Service and the timber industry intervenors (collectively referred to as "the defendants") argue that all other issues raised in plaintiffs' complaint, except for the Freedom of Information Act attorney's fee issue (Count VI), should be dismissed on the grounds of standing, ripeness, and failure to exhaust administrative remedies. The court examines each of these issues in turn.

## I.   EXHAUSTION

■   The question of exhaustion arises because plaintiffs' Second Amended Complaint seeks judicial review of Forest Service actions on which plaintiffs have pending administrative appeals. Final decisions on these appeals are three to five months overdue, but expected within the month.[2]

The government and intervenors argue that Eighth Circuit precedent requires dismissal of claims where administrative remedies have not been exhausted, but the Eighth Circuit has not in fact established such a rule. *See, e.g., Arkla Exploration Co. v. Texas Oil & Gas,* 734 F.2d 347, 355 (8th Cir.1984) (exhaustion doctrine would not be applied to state when at the time state had standing to challenge leases, Secretary of Interior had invalidated them, but later court of appeals decision ordering Secretary to reinstate leases made it unlikely that state could ever get relief in administrative proceedings), *cert. denied,*

---

**1.**   In February, 1991, the Forest Service vacated the decisions for Cold Springs Compartment 254 and Fourche Compartments 447 and 448.

**2.**   The court has before it the affidavits of James C. Overbay and Allan J. West, who are responsible for deciding the appeals in issue here. Overbay's affidavit indicates that while a final decision, pursuant to 36 C.F.R. § 217.8, on the

administrative appeals to the Amended LRMP and its EIS Supplement were due December 27, 1990, that this decision will in fact be rendered on April 15, 1991. The statements by Allan West indicate that though a final decision on the appeal of the Forest Service's approval of the FEIS and the ROD, was, pursuant to 36 C.F.R. § 217.8, due November 14, 1990, it is now expected by April 30, 1991.

469 U.S. 1158, 105 S.Ct. 905, 83 L.Ed.2d 920 (1985). Although the doctrine of exhaustion of administrative remedies is applied in a number of different situations, it is "like most judicial doctrines subject to numerous exceptions." *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969). The doctrine is based on the principle that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–64, 82 L.Ed. 638 (1938). Absent a specific statutory requirement, however, exhaustion of administrative remedies is "sometimes required and sometimes not." 4 K. Davis, *Administrative Law Treatise* § 26.1 at 4.14 (2d ed. 1983). *See also Morrison–Knudsen Co., Inc. v. CHG International Inc.,* 811 F.2d 1209, 1225 (9th Cir.1987) ("where there is no explicit statutory requirement of exhaustion of administrative remedies, the application of exhaustion rules is a matter committed to the discretion of the district court"). This judicially-created doctrine "does not limit jurisdiction;" rather it furnishes the district court with "a method to exercise comity toward administrative agencies and to promote efficient use of the judicial resources while protecting the rights of parties who have come before the court seeking relief." *Morrison–Knudsen,* 811 F.2d at 1223.

In applying this doctrine to the case at hand the court therefore has several options: it may allow the action to proceed immediately, dismiss the action pending exhaustion of administrative review, or institute a stay of these proceedings pending administrative review. The Supreme Court, in *McGee v. United States,* 402 U.S. 479, 491, 91 S.Ct. 1565, 1572, 29 L.Ed.2d 47 (1971) and *McKart,* 395 U.S. at 197, 89 S.Ct. at 1664–65, has held that the district court's exhaustion decision should reflect a "discrete analysis of the particular default in question, to see whether there is a 'governmental interest compelling enough to' justify the forfeiting of judicial review." *McGee,* 402 U.S. at 485, 91 S.Ct. at 1569 (quoting *McKart,* 395 U.S. at 197, 89 S.Ct.

at 1664). *McGee* and *McKart* identify three types of governmental interests which the court needs to review. First, the requirement of exhaustion enables the agency to correct its own errors and so preclude, perhaps entirely, the need for judicial review. Second, the agency has an interest in developing the factual background of the case so that it can exercise its expertise on a fully developed record prior to consideration by the court. (These interests are served by a temporary stay of proceedings in this court pending the outcome of the administrative appeal just as well as they would be by an outright dismissal.) Finally, the court must also consider the government's interest in discouraging litigants from by-passing administrative remedies prior to seeking judicial review.

The Eighth Circuit has ordered dismissal of claims where administrative remedies have not been exhausted in cases where the plaintiff utterly bypassed the available administrative process. *See, e.g., McAlister v. Secretary of HHS,* 900 F.2d 157, 158 (8th Cir.1990) (dismissal of employee discrimination suit where employee failed to assert timely claim with the EEOC); *Watson v. Arkansas National Guard,* 886 F.2d 1004, 1008 (8th Cir.1989); *Madsen v. Dept. of Agriculture,* 866 F.2d 1035, 1037 (8th Cir.1989) (failure to appeal agency's established yield figures, before they were established by statutes, required dismissal of farmers' claims). The case at bar, however, does not present such a difficulty. Plaintiffs have been involved in protracted and complex administrative proceedings that seem to be unending. The plaintiffs' claims in this case were originally brought to stop certain timber sale decisions and clear-cutting practices allowed under the 1986 LRMP upon which the underlying administrative appeals had been concluded. The Forest Service later indicated that it would stop clearcutting and withdrew the contested sales decisions. They then issued new sales decisions which were subsequently withdrawn. Plaintiffs have amended their complaint two times in an effort to keep current with these and other

changes. An examination of the litigation history in this matter indicates that the Forest Service has developed a practice of making, withdrawing, and reinstating timber sales and forest policy decisions in a way that might forestall judicial review indefinitely if left unchecked. Such a result cannot be encouraged.

In light of the above, the government's interests are not "compelling enough to justify the forfeit[ure] of judicial review." *McGee*, 402 U.S. at 485, 91 S.Ct. at 1569. In fact, the interests of all parties, as well as the court's interest in benefitting from Forest Service expertise in these matters, would be best served by a brief stay of proceedings in this court until after administrative proceedings have been concluded, that is, at least until April 30, 1991.

## II. STANDING AND RIPENESS

The court will now address the issue of plaintiffs' statutory and constitutional standing to contest the Amended LRMP and its supporting documents.[3]

### A. *Constitutional Standing*

■ Because this court's power is limited by Article III of the United States Constitution to the resolution of "cases" and "controversies," plaintiffs must, in addition to satisfying the statutory requirements for standing discussed below, show that the court has jurisdiction under Article III. What is required by the Administrative Procedure Act, however, is in this case so similar to the constitutional requirements, that a lengthy separate discussion is not really required.

The Supreme Court has held that, at a minimum, Article III

> requires the party who invokes the court's authority to "show that he personally has suffered some actual or

threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 [99 S.Ct. 1601, 60 L.Ed.2d 66] (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1925–26, 48 L.Ed.2d 450] (1976).

*Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982) (footnote omitted). Or in slightly different terms, the court may ask:

> Is the injury too abstract, or otherwise not appropriate to be considered cognizable? Is the line of causation between the illegal conduct and injury too attenuated? Is the prospect of obtaining relief from the jury as a result of a favorable ruling too speculative?

*Allen v. Wright*, 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984). Succinctly put, these concepts are described by the defendants as requirements of "injury in fact," "traceability" and "redressability."

As to the requirement of "injury in fact," defendants urge the court to view the LRMP as a "programmatic statement of intent," which cannot cause the plaintiffs harm. They argue that "the plan does not require the Forest Service to sell a specific quantity of timber. It does not decide on any specific harvest location, nor does it require a specific harvest method for any sale." Govt. Reply Mem. at 4. The court does not take this view; but because this argument relates directly to the question of whether the Forest Plan, for the purposes of 5 U.S.C. §§ 702, 704, is a "final agency

---

**3.** The court will treat the defendants' motion to dismiss and plaintiffs' motion for summary judgment as to standing as cross motions for summary judgment. Accordingly, the court will assess the record under the standards required by Rule 56(e) of the Federal Rules of Civil Procedure. Under this standard, when a defendant moves for summary judgment in a suit brought under 5 U.S.C. § 702, on the ground that plaintiff has failed to show that he is ad- versely affected or aggrieved by agency action within the meaning of a relevant statute, the burden is on the party seeking review under § 702 to set forth specific facts showing that he has satisfied its terms (even though they may be controverted by the government). *Lujan v. National Wildlife Federation*, —— U.S. ——, —— – ——, 110 S.Ct. 3177, 3186–87, 111 L.Ed.2d 695 (1990).

action," it will be discussed in some detail in Section B(ii) below. The court also notes that review of Forest Service Planning at the LRMP stage is certainly not unprecedented, and has for some time now been considered to be judicially cognizable by other district courts. *See, e.g., Sierra Club v. Cargill,* 732 F.Supp. 1095 (D.Colo. 1990); *Citizens for Environmental Quality v. United States,* 731 F.Supp. 970 (D.Colo.1989); *Intermountain Forest Industry Ass'n v. Lyng,* 683 F.Supp. 1330 (D.Wyo.1988).

A closely related question is whether or not the injury complained of has been caused by the defendants' action. The Government argues that "plaintiffs have not and cannot show that the injury they complain of is *traceable* to the Forest Service's approval of the LRMP and its Amendments." Govt. Reply Mem. at 3 (emphasis added). The defendants assert, in this regard, that the injuries alleged by the plaintiffs in their affidavits and in the complaint, are so remote that they cannot be "traced" to the Forest Service's approval of the LRMP and its attendant documentation.[4] But it is fairly clear that the 1990 LRMP does, as it is in fact mandated to do by 36 C.F.R. 219.11, designate specific ar-

eas as suitable for timber production.[5] It also specifies methods for that production. Plaintiffs contest the amount of land designated by the LRMP as suitable for such production and the harvesting methods allowable under the FEIS. There is, thus, a positive connection between the action and its effects on the plaintiffs.

In sum, the injury alleged here is not of a speculative type as it arises directly from the Forest Service's approval of the allegedly invalid Forest Management Plan. A favorable decision, moreover, as for example a decision that even aged management techniques allowed by the plans fail to meet NEPA's and NFMA's requirement of diversity in the National Forest,[6] would afford plaintiffs relief, as the Forest Service would then be required to establish suitable methods for accounting for and then measuring diversity in the Ouachitas. Thus the injuries alleged by the plaintiffs are both "traceable" to the threatened activity, and "redressable" by a favorable decision in this proceeding.

### B. *Statutory Standing*

Neither NEPA nor NFMA provides a private right of action for violations of their provisions. The plaintiffs, however,

---

**4.** Defendants rely primarily on *Idaho Conservation League v. Mumma,* No. 88–197–M–CCL, 1990 WL 300860 (D.Mont.1990), to support their arguments urging dismissal on this point. While the facts of *Mumma* were somewhat similar to the facts presented here, these cases are distinguishable in significant respects. In *Mumma,* plaintiffs requested the court to declare that defendants violated NFMA, NEPA and the APA by not providing a rational explanation for their decision not to recommend wilderness designations for 43 roadless areas on a National Forest. The Idaho Conservation League was of course concerned that areas not designated as wilderness might someday be developed, but the district court found that such a concern was too "remote" because there were no actual proposals for development of the roadless areas. In contrast, the LRMP under attack here proposes that certain areas are suitable for timber sales, and suggests a range of allowable harvesting techniques.

**5.** 36 C.F.R. 219.11 states in relevant part— The forest plan *shall* contain the following:

(c) Multiple-use *prescriptions* and associated standards and guidelines for each manage-

ment area including proposed and probable management practices such as the planned timber sale program; and

(d) *Monitoring* and *evaluation requirements* that will provide a basis for a periodic determination and evaluation of the effects of the management.

**6.** NFMA, 16 U.S.C. 1604(g)(3)(B) states:

[The plan] shall ... provide for diversity of plant and animal communities based on the capability of the specific land area in order to meet overall multiple use objectives ..., and provide, where appropriate, to the degree practicable, for steps to be taken to preserve the diversity of tree species similar to that existing in the region controlled by the plan. The regulations define diversity as "The distribution and abundance of different plant and animal communities and species within the area covered by a land and resource management plan." 36 C.F.R. 219.3.

seek judicial review pursuant to Section 10(a) of the Administrative Procedure Act (APA), 5 U.S.C. § 702. That section states in relevant part:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

5 U.S.C. § 702. This provision contains two separate requirements. First, plaintiffs must identify some "agency action" that affects them in the specified fashion; it is judicial review thereof to which they are entitled. The meaning of "agency action" for purposes of § 702 is set out in 5 U.S.C. § 551(13), see 5 U.S.C. § 701(b)(2), which defines the term as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Where, as here, review is sought only under the general review provisions of the APA, rather than pursuant to specific authorizations in the underlying statutes, the "agency action" identified must be "final agency action." *Lujan v. National Wildlife Federation,* —— U.S. ——, ——, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990) (citing 5 U.S.C. § 704, "agency action made reviewable by statute and *final agency action* for which there is no other adequate remedy in a court are subject to judicial review" (emphasis added)). Second, parties seeking review under § 702 must show that they have either suffered legal wrong because of the agency's act, or are "adversely affected or aggrieved" by that action "within the meaning of a relevant statute." The plaintiffs do not assert that they have suffered a legal wrong, so the court need only consider whether plaintiffs have suffered adverse consequences or aggrievement.

### i. Aggrievement

■ The Supreme Court has stated that to be "adversely affected or aggrieved ... within the meaning" of a statute, the plaintiff must establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him* ) falls within the "zone of interests" sought to be pro-tected by the statutory provision whose violation forms the legal basis for his complaint. *See Clarke Securities Industry Assn.,* 479 U.S. 388, 396–97 [107 S.Ct. 750, 755–56, 93 L.Ed.2d 757] (1987).

*Lujan, supra* —— U.S. at ——, 110 S.Ct. at 3186. The relevant statute is of course the statute whose violation is the gravamen of the complaint—in this case, both NEPA and NFMA. There is no question but that "recreational use and aesthetic enjoyment" are among the sorts of interests that both NEPA and NFMA were specifically designed to protect. The "zone of interests" test is thus satisfied by plaintiffs' allegations of adverse effects on these interests. *See Lujan, supra* —— U.S. at ——, 110 S.Ct. at ——; NFMA, 16 U.S.C. § 1604(e) (requiring plans to provide for recreation, timber, wildlife, watershed, and wilderness usage); *Goos v. I.C.C.,* 911 F.2d 1283, 1290 (8th Cir.1990) (injury in fact is not confined to those who can show an economic injury, but includes as well injury to aesthetic and environmental well being.) The defendants do not, moreover, argue otherwise.

■ Defendants do seem to argue that plaintiffs have not shown that they are "actually" affected by the alleged injury as was required by the Court in *Lujan.* In that case the Court held that certain affidavits were flawed because the affiants stated only that they recreated on land "in the vicinity" of the area which was to be opened up for mining. The Court held that plaintiffs had therefore failed to show that their use of the "particular" lands designated by the Bureau had "actually" been affected by the Bureau's decision to open that land up for mining and mineral exploration. Plaintiffs' affidavits here, however, describe in detail specific parts of the forest that the affiants enjoy, activities that they engage in there, and the types of harm that they allege ensue from the use of herbicides and even aged management techniques allowable under the current plan. The affidavits raise a variety of concerns, from the proliferation of ticks and disease in the aftermath of clearcutting, to spoiled vistas, clogged fishing and canoeing streams, contaminated berries, declines in

tourist trade and the resultant income, loss of wildlife habitats, and degradation to the plaintiffs' abilities to enjoy camping, hiking, bird watching, and botanical pursuits in the Ouachitas. Thus the problem of specificity which arose in *Lujan* does not arise here, and plaintiffs' affidavits are sufficient to meet the requirement of "aggrievement" under 5 U.S.C. § 702.

### ii. Agency Action

■ The defendants contend that the plaintiffs' complaint challenges what should be viewed as "programmatic documents," and that the Forest Service's approval of such documents, does not constitute "final agency action," 5 U.S.C. §§ 702, 704, and so is not ripe for judicial review. This argument also goes to the question of standing, particularly the requirements of "injury in fact" and "traceability" as they are described briefly in part II (A) of this opinion. Rhetoric aside, the defendants essentially base this part of their motion on the assertion that the LRMP and FEIS are of so little import that their approval can neither injure the plaintiffs nor be described as any sort of action. The Forest Service describes the Amended LRMP as a "programmatic statement of intent" which "does not commit the agency to conduct any ground disturbing project." Govt. Mem. at 4. The government acknowledges that the "courts have permitted judicial review at the LRMP stage in a number of cases decided before the Supreme Court

ruling in *Lujan* ...," [7] but claims that the Amended LRMP and associated documents are so general and non-specific that they are not reviewable by this court after the Supreme Court's (somewhat "abstract") [8] discussion of this issue in *Lujan*.[9]

This argument is problematic for at least two reasons. First, as was stressed by that Court, there was, in *Lujan*, no actual "program" and so no "agency action" challengeable under 5 U.S.C. §§ 702, 704. The Court stated:

> The term land "withdrawal review program" (which as far as we know is not derived from an authoritative text) does not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations. It is simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawn revocation applications and the classifications of public lands, and the developing of land use plans as required by FLPMA. It is no more an identifiable "agency action"—much less a "final agency action" than a weapons procurement program of the Department of Defense or a "drug interdiction program" of the Drug Enforcement Administration.

*Lujan, supra* —— U.S. at ——, 110 S.Ct. at 3189. Here, however, the court, theoretically at least, has before it an actual

---

7. Govt.Mem. at 9, citing *Sierra Club v. Cargill,* 732 F.Supp. 1095 (D.Colo.1990); *Citizens for Environmental Quality v. United States,* 731 F.Supp. 970 (D.Colo.1989); *Intermountain Forest Industry Assn. v. Lyng,* 683 F.Supp. 1330 (D.Wyo.1988).

8. *Lujan, supra,* dissent —— U.S. ——, 110 S.Ct. at 3201 (Blackmun J., dissenting).

9. In considering whether or not plaintiff should be entitled to challenge the some 1,250 individual land withdrawal decisions, which allowed mineral leasing and mining on 180 million acres of land in 17 states (less than one percent of that amount of land is involved in this case), the Court stated as follows:

> [R]espondent cannot seek *wholesale* improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic im-

provements are normally made. Under the terms of the APA, respondent must direct its attack against some particular "agency action" that causes it harm. Some statutes permit broad regulations to serve as the "agency action," and thus to be the object of judicial review directly, even before the concrete effects normally required for APA review are felt. Absent such a provision, however, a regulation is not ordinarily considered the type of agency action "ripe" for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.
> *Lujan, supra* —— U.S. at ——, 110 S.Ct. at 3190.

and "integrated plan" for management of the Ouachita National Forest, as such is in fact mandated by the NFMA.[10] The regulations implementing the NFMA, moreover, require that the plan include *prescriptive* measures and standards for managing the forest, stating in part:

The forest plan *shall* contain the following:

. . . . .

(c) Multiple-use *prescriptions* and associated standards and guidelines for each management area including proposed and probable management practices such as the planned timber sale program; and (d) *Monitoring* and *evaluation requirements* that will provide a basis for a periodic determination and evaluation of the effects of the management.

36 C.F.R. § 219.11 (emphasis added). The second problem with defendants' argument is that the challenged documents themselves indicate that they establish methods by which forest management decisions are to be made. For example, in the FEIS, (Final Environmental Impact Statement regarding Vegetation Management in the Ozark/Ouachita Mountains (Vol. I, p. I–8)), the section entitled "Scope of Decisions" explains that:

This EIS is used to make *decisions about how the vegetation management program on the national forests in the Ozark/Ouachita Mountains is conducted.* Major decisions are (1) what *methods and tools are allowed;* (2) *what intensity and frequency of treatment are used;* and (3) what *management requirements and mitigation measures* may be used when making site-specific decisions in the future.

(emphasis added). In contesting the validity of the Amended LRMP and FEIS, plaintiffs have also challenged the adequacy of the management tools and methods allowable under these documents.

In short, the court is in this case faced with an "integrated plan," 16 U.S.C. § 1604(*l*), which appears, as it must, to make certain decisions regarding forest management. This is the final plan, and no other management guidelines for the forest as a whole need come now. Though the Forest Service argues that it may in fact alter the plan after it is adopted, and not utilize the harvesting patterns or techniques recommended by the plan, such an ability should not work to insulate all of its decisions from judicial review. The Supreme Court in *Lujan* clearly did not intend to preclude review of a plan simply because a project level decision, in this case a particular timber sale, has not been made. The Court stated:

If there is in fact some specific order or regulation applying some particular measure across-the-board to all individual classification determination and withdrawal revocations, and if that order or regulation is final, and has become ripe for review ... it can of course be challenged under the APA by a person affected—and the entire "land withdrawal review program," insofar as the content of that particular action is concerned, would thereby be affected.

*Lujan, supra,* —— U.S. at —— n. 2, 110 S.Ct. at 3190 n. 2.

If the court were to adopt the defendants' interpretation of *Lujan,* then plaintiffs would not be entitled to judicial review of the validity of the Amended LRMP, FEIS, and the RODs adopting these documents until the Forest Service finally approves a particular timber sale and plaintiffs manage to exhaust the administrative appeal process attendant upon that sale. Upon seeing firsthand the practice that the Forest Service has developed of issuing a decision, upholding it on administrative appeal, and then withdrawing it after plaintiff has filed a lawsuit, it appears to the court that such a result would put plaintiffs in the unhappy, not to mention costly, position of being required to file numerous complaints before getting to the stage where

---

**10.** NFMA, 16 U.S.C. § 1604 requires:
Plans developed in accordance with this section shall: (1) form one integrated plan for each unit of the National Forest System, incorporating in one document, or one set of documents, available to the public at convenient locations, all of the features required by this section.

judicial review could be granted. Even then, the right to standing would be tenuous at best, because the Forest Service could again withdraw the sale decision. During the course of this very litigation the Forest Service has three times withdrawn a series of contested timber sales decisions shortly after plaintiffs amended their complaint to include the sales decisions. While the court does not wish to discourage the Forest Service from withdrawing sales decisions that it, upon further reflection, believes to be incorrect, withdrawal as a litigation tactic is flagrantly wasteful of this court's resources as well as those of the plaintiffs. Fortunately, this sort of waste is not required by *Lujan*.

## III. CONCLUSION

For the reasons stated above, defendants' motion to dismiss, which has been treated as a motion for summary judgement as to standing, will be granted only as to plaintiffs' claims involving the 1986 LRMP and the recently withdrawn timber sales decisions included in Count II of plaintiffs' second amended complaint. The remainder of plaintiffs' claims will be retained, but all further proceedings in this case, including rulings on substantive and procedural motions such as the plaintiffs' motions for docket control order, summary judgment, and for supplementation of the administrative record as well as any new motions to intervene, will be stayed pending a final decision on the administrative appeals to the Amended LRMP, FEIS, and RODs supporting these documents.